# United States Court of Appeals
## For the Eleventh Circuit

No. 05-16756

District Court Docket No.
04-00059-CR-001-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jul 6, 2007

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

versus

CHARLES W. WALKER, SR.,
THE CWW GROUP, INC.,
a.k.a. The Walker Group,
GEORGIA PERSONNEL SERVICES, INC.
THE AUGUSTA FOCUS, INC.

        Defendants-Appellants.



A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

-------------------------------------------------------------------
Appeal from the United States District Court
for the Southern District of Georgia
-------------------------------------------------------------------

## JUDGMENT

    It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:    July 6, 2007
For the Court:    Thomas K. Kahn, Clerk
By:    Jackson, Jarvis

ISSUED AS MANDATE
SEP 1 8 2007
U.S. COURT OF APPEALS
ATLANTA, GA.



CLERK
S.O. DIST. OF GA.

2007 SEP 19 P 2: 14

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

U.S. v. WALKER     2745

UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles W. WALKER, Sr., The CWW
Group, Inc., a.k.a. The Walker Group,
Georgia Personnel Services, Inc., The
Augusta Focus, Inc., Defendants–Appel-
lants.

No. 05–16756.

United States Court of Appeals,
Eleventh Circuit.

July 6, 2007.

**Background:** Defendants were convicted
in the United States District Court for the
Southern District of Georgia, No. 04-
00059-CR-001-1, Dudley H. Bowen, Jr., J.,
of conspiracy, mail fraud, and tax evasion.
Defendants appealed.

**Holdings:** The Court of Appeals, Wilson,
Circuit Judge, held that:

(1) government established *prima facie*
case of purposeful discrimination under
*Batson*;

(2) defendants' use of four peremptory
strikes to remove four white jurors
violated *Batson*;

(3) reinstatement of jurors who were
struck was proper remedy for *Batson*
violations;

(4) indictment was sufficient to allege hon-
est services mail fraud;

(5) evidence was sufficient to support con-
viction for honest services mail fraud;

(6) principles of federalism did not pre-
clude mail fraud and honest services
mail fraud convictions; and

(7) imposition of abuse of trust sentencing
increase was warranted.

Affirmed.

**1. Constitutional Law** ⟜3309

Equal Protection Clause forbids a prose-
cutor from striking potential jurors solely on
account of their race. U.S.C.A. Const.
Amend. 5.

**2. Jury** ⟜33(5.15)

Under *Batson*, a party challenging a
peremptory strike to excuse a juror must
make a *prima facie* showing that a peremp-
tory challenge has been exercised on the
basis of race or gender.

**3. Jury** ⟜33(5.15)

If the party challenging a peremptory
strike to excuse a juror makes a *prima facie*
case for a *Batson* violation, the other party
must offer a race or gender-neutral basis for
striking the juror in question.

**4. Jury** ⟜33(5.15)

Under *Batson*, in light of both parties'
submissions, the trial court must determine
whether the party challenging a peremptory
strike has shown purposeful discrimination.

**5. Criminal Law** ⟜1158(3)

In reviewing the district court's *Batson*
analysis, the Court of Appeals gives great
deference to the district court's finding of
whether a *prima facie* case of discrimination
exists.

**6. Criminal Law** ⟜1158(3)

Once past the *prima facie* step in the
*Batson* analysis, the district court's determi-
nation concerning the actual motivation be-
hind each challenged peremptory strike
amounts to pure factfinding, and the Court of

Synopsis, Headnotes and Key Number Classification
COPYRIGHT © 2007 Thomson/West

The Synopsis, Headnotes and Key Number Classifi-
cation constitute no part of the opinion of the court.

2746                        U.S. v. WALKER

Appeals will reverse only if the decision is clearly erroneous.

**7. Jury ⟨⟩33(5.15)**

Government established *prima facie* case of purposeful discrimination, as required to show *Batson* violation, in prosecution against African-American defendant and corporate defendants for conspiracy, mail fraud, and tax evasion; defendants used all of their 10 peremptory strikes against whites, striking 10 of the 18 white jurors available, and they also used both of their alternate strikes to remove whites from the alternate jury pool.

**8. Jury ⟨⟩33(5.15)**

While a party challenging a juror's removal under *Batson* is required to present evidence other than the bare fact of a juror's removal to establish a *prima facie* case of purposeful discrimination, a pattern of strikes against all venire members of one race or gender is considered significant.

**9. Jury ⟨⟩33(5.15)**

Under *Batson*, almost any plausible reason can satisfy the striking party's burden to articulate a non-discriminatory reason for the peremptory strike, as long as the reason is race or gender neutral.

**10. Jury ⟨⟩33(5.15)**

Government demonstrated that defendants' proffered reasons for using peremptory strikes to remove four white jurors, that one had a degree in finance and was an accountant, that one had supervisory experience, that one presented a hostile demeanor, and that one had prior service on city council, were pretextual, and thus, strikes violated *Batson*, in prosecution against African-American politician for conspiracy, mail fraud, and wire fraud; other jurors who had finance backgrounds and supervisory experience were not struck, counsel asked no questions of the juror who was struck because of his hostile demeanor, so they could not have evaluated his demeanor, and service on city council was insufficient, absent knowledge of the juror's political party affiliation or bias.

**11. Jury ⟨⟩33(5.15)**

The district court's perception of an attorney's credibility is an essential part of determining whether a proffered reason for a peremptory strike was pretextual, for *Batson* purposes.

**12. Jury ⟨⟩121**

Reinstatement of four white jurors who were improperly struck by defendants, without giving defendants replacement peremptory strikes, was proper remedy for *Batson* violations, in prosecution for conspiracy, mail fraud, and tax evasion; some of the members of the jury pool had driven several hours to attend the jury selection, the *Batson* challenges were decided late in the evening, and the extra venire members had already been dismissed, with defendants' consent, so that granting defendants replacement strikes would have required the court to start the jury selection process the next day, at considerable time and expense.

**13. Jury ⟨⟩121**

As with the remedy for any constitutional violation, in fashioning a remedy for a *Batson* violation, courts should take as their touchstone the basic proposition that the nature of the remedy must be determined by the nature and the scope of the constitutional violation.

**14. Criminal Law ⟨⟩1152(2)**

The Court of Appeals reviews a district court's chosen remedy to correct a *Batson* violation only for abuse of discretion.

**15. Criminal Law ⚖1139**

The Court of Appeals reviews *de novo* whether an indictment sufficiently alleges a statutorily proscribed offense.

**16. Criminal Law ⚖1139**

The Court of Appeals reviews *de novo* the sufficiency of the evidence supporting a criminal conviction.

**17. Criminal Law ⚖1144.13(3, 5, 6)**

In reviewing a conviction for sufficiency of the evidence, the appellate court views the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor.

**18. Criminal Law ⚖1159.2(7)**

The Court of Appeals will reverse a conviction based on insufficient evidence only if no reasonable trier of fact could have found guilt beyond a reasonable doubt.

**19. Indictment and Information ⚖60, 71.2(2, 4)**

An indictment is sufficient if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense. U.S.C.A. Const.Amend. 5; Fed.Rules Cr.Proc.Rule 7(c), 18 U.S.C.A.

**20. Indictment and Information ⚖110(3)**

An indictment that tracks the language of the relevant statute is sufficient, as long as it also provides a statement of facts and circumstances that give notice of the offense to the accused. Fed.Rules Cr.Proc.Rule 7(c), 18 U.S.C.A.

**21. Indictment and Information ⚖110(15)**

**Postal Service ⚖48(4.2)**

Indictment sufficiently alleged that defendant engaged in honest services mail fraud; indictment tracked the language of the mail fraud statute, it stated that defendant and his personnel corporation engaged in a scheme to misuse his position as a state legislator for private gain by receiving business favors, including a lucrative contract for hospital to hire workers from his personnel corporation in return for defendant's help with legislation affecting a hospital, and it also alleged that defendant failed to properly disclose his financial dealings with the hospital in his annual financial disclosure statements as a legislator. 18 U.S.C.A. § 1346.

**22. Postal Service ⚖35(2)**

To prove mail fraud, the prosecution must demonstrate that the defendant (1) participated in a scheme or artifice to defraud and (2) used the United States mails to carry out that scheme. 18 U.S.C.A. § 1341.

**23. Postal Service ⚖35(9)**

The honest services provision of the mail fraud statute allows the government to predicate a mail fraud prosecution on a scheme or artifice to deprive another of the intangible right to honest services. 18 U.S.C.A. § 1346.

**24. Postal Service ⚖35(9)**

If a public official secretly makes a governmental decision based on his own personal interests, as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest, the official has deprived the public of his honest services, as would violate honest services mail fraud statute. 18 U.S.C.A. § 1346.

U.S. v. WALKER

**25. Postal Service ⇐35(9)**

Even if a public official engages in reprehensible misconduct related to an official position, his conviction for honest services mail fraud cannot stand where the conduct does not actually deprive the public of its right to his honest services, and it is not shown to intend the result. 18 U.S.C.A. § 1346.

**26. Postal Service ⇐35(5)**

Once the government establishes a scheme formed with the intent to defraud, the honest services mail fraud is complete regardless of how that intent manifests itself in execution. 18 U.S.C.A. § 1346.

**27. Postal Service ⇐49(11)**

Evidence was sufficient to support conviction of defendant, a state legislator, for honest services mail fraud; government presented evidence that defendant met at state capitol with hospital's chief executive officer (CEO) and that defendant suggested that the hospital hire workers through temporary personnel agency owned by defendant, hospital employee testified that the CEO introduced defendant to her as someone who would be doing business with the hospital and would help with certain legislation, hospital awarded a contract to defendant's agency and hired agency's workers, and hospital employees testified that it was cost-ineffective to hire workers from defendant's agency, and that defendant repeatedly requested that hospital hire additional workers through his agency. 18 U.S.C.A. § 1346.

**28. States ⇐18.63**

Principles of federalism did not preclude mail fraud and honest services mail fraud convictions of defendant, a state legislator, predicated on defendant's making of false representations to state medical college officials about his ownership interest in his corporations and failure to disclose transactions between his corporation and medical college; although state law prohibited state office holders from contracting with state agencies, and required state office holders to disclose financial transactions, the district court specifically cautioned the jury that it could not decide whether the defendant violated any state law, but could only consider state laws to the extent the evidence indicated an intent to commit fraud on defendant's part. 18 U.S.C.A. § 1346.

**29. States ⇐4.4(1)**

The principles of federalism recognize that the states and the federal government exist as dual sovereigns, constraining the federal government from exerting federal power in areas that the Constitution reserves to the states.

**30. States ⇐4.4(1)**

Pursuant to traditional norms of federalism, a federal court may not instruct state officials on how to conform their conduct to state law, because this power is reserved to the states.

**31. Postal Service ⇐35(2, 9)**

An honest services mail fraud or mail fraud conviction does not require proof of a state law violation. 18 U.S.C.A. §§ 1341, 1346.

**32. Criminal Law ⇐1158(1)**

For sentencing decisions, the Court of Appeals reviews the district court's factual findings for clear error.

**33. Criminal Law ⇐1139**

The district court's decision of whether the factual findings justify a sentencing enhancement is reviewed *de novo*.

**34. Sentencing and Punishment ⬥736**

Funds that defendant convicted of mail fraud and conspiracy stole from non-profit scholarship organization would be counted for purposes of determining loss amount at sentencing, even though defendant was acquitted of tax evasion with respect to those funds.

**35. Sentencing and Punishment ⬥736**

A jury acquittal on one count does not imply a finding as to the loss amount, for sentencing purposes.

**36. Sentencing and Punishment ⬥758**

Imposition of abuse of trust sentencing increase was warranted for defendant convicted of mail fraud and conspiracy, in connection with his activities of stealing funds from non-profit scholarship organization; defendant was head of the charity, he exercised virtually unfettered decision-making authority in running certain charity events, and he collected money donated to the charity. U.S.S.G. § 3B1.3, 18 U.S.C.A.

**37. Sentencing and Punishment ⬥906**

Imposition of sentencing increase for misrepresentation of a charitable organization, in addition to the abuse of trust sentencing increase, did not amount to impermissible double counting for defendant convicted of mail fraud and conspiracy, in connection with his activities of stealing funds from non-profit scholarship organization; defendant's conduct harmed the charity, meriting the abuse of trust increase, and it also harmed the charity's donors, meriting a separate enhancement for misrepresentation of a charity. U.S.S.G. §§ 2B1.1(b)(8)(A), 3B1.3, 18 U.S.C.A.

**38. Sentencing and Punishment ⬥651**

Each Sentencing Guidelines section concerns conceptually separate notions relating to sentencing and a sentencing court should apply separate guideline sections cumulatively unless specifically directed otherwise. U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**39. Sentencing and Punishment ⬥752**

Imposition of supervisory role sentencing enhancement, based on determination that criminal scheme was "otherwise extensive," was warranted for defendant convicted of various counts of mail fraud, conspiracy, and tax evasion; defendant's employees knew about certain misrepresentations and actively participated in the scheme, and defendant's daughter was indicted for her role in the fraud and pled guilty to tax charges related to the scheme. U.S.S.G. § 3B1.1(b), 18 U.S.C.A.

**40. Sentencing and Punishment ⬥752**

For criminal activity to qualify as "otherwise extensive," as will justify a supervisory role sentencing increase, there must be at least one other participant in the criminal activity. U.S.S.G. § 3B1.1(b), 18 U.S.C.A.

See publication Words and Phrases for other judicial constructions and definitions.

---

Appeals from the United States District Court for the Southern District of Georgia.

Before EDMONDSON, Chief Judge, and BIRCH and WILSON, Circuit Judges.

WILSON, Circuit Judge:

Charles W. Walker, Sr. was indicted by a grand jury in the Southern District of Georgia for conspiracy, mail fraud, and tax evasion. The indictment charged Walker with misusing his public office for personal gain. Walker is a former Georgia state legislator,

newspaper publisher, and businessman. He was charged along with three corporate defendants: The Augusta Focus, Inc. (the "Augusta Focus"), a local newspaper that Walker published; Georgia Personnel Services, Inc. ("Georgia Personnel"), a staffing company owned by Walker that provides temporary workers to hospitals and other companies; and The CWW Group, Inc. (the "CWW Group"), a holding company that owns other companies and is owned by Walker (collectively "Defendants"). Defendants appeal their convictions and Walker appeals his sentence, contending that (1) during jury selection, the district court erroneously disallowed four of Walker's peremptory strikes after finding a *Batson*[1] violation; (2) honest services mail fraud was improperly charged in the indictment and not supported by sufficient evidence; (3) prosecuting Walker for mail fraud violates basic principles of federalism; and (4) various sentencing enhancements were improperly imposed by the district court. Finding no reversible error as to any of these issues, we affirm.

### Background

Walker operated his various businesses while simultaneously serving as a member of the Georgia General Assembly. The 142-count indictment first alleged that Walker, the CWW Group and the Augusta Focus engaged in a scheme to fraudulently obtain profits from businesses that advertised in the Augusta Focus by misrepresenting the newspaper's circulation. The indictment alleged that this scheme amounted to mail fraud in

violation of 18 U.S.C. § 1341, and conspiracy to commit mail fraud in violation of 18 U.S.C. § 371. (These charges are henceforth referred to as the "Augusta Focus counts").[2]

The indictment further alleged that Walker, the CWW Group, and Georgia Personnel engaged in a scheme to misuse Walker's position as a state legislator for private gain by receiving business favors, including a contract to hire Georgia Personnel workers from Grady Memorial Hospital ("Grady"), in return for Walker's help with legislation affecting Grady. These counts (the "Grady counts") charged mail fraud in violation of 18 U.S.C. § 1341, and honest services mail fraud in violation of 18 U.S.C. § 1346.

Defendants were also accused of engaging in a scheme to improperly transact business with a state entity, the Medical College of Georgia ("the Medical College"), by: (a) misrepresenting to the Medical College that Walker did not own a substantial interest in Georgia Personnel or the Augusta Focus when he did; and (b) failing to disclose Walker's transactions with the Medical College on state-mandated financial disclosure reports (the "Medical College counts"). In Georgia, a state legislator is not permitted to engage in business with a state agency except in certain limited circumstances not applicable here.[3] The Medical College counts charged mail fraud in violation of 18 U.S.C. § 1341, and honest services mail fraud in violation of 18 U.S.C. § 1346.

The indictment further charged that Walker and the CWW Group engaged in a scheme

---

1. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. Walker does not appeal his conviction on the Augusta Focus counts.

3. Georgia law includes a code of ethics and conflicts of interest, GA.CODE ANN. §§ 45–10–1 to –94, and the Ethics in Government Act, GA.CODE ANN. § 21–5–1 to –76. Section 45–10–24(a)(1) states:

[I]t shall be unlawful for any part-time public official who has state-wide powers for himself or on behalf of any business, or for any business in which such public official or member of his family has a substantial interest to transact any business with any agency.

to steal cash proceeds from annual fundraising events by C.S.R.A. Classic, Inc. ("Classic"), a charity set up by Walker. These forty-six counts (the "Classic counts") charged mail fraud, in violation of 18 U.S.C. § 1341, and conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371. Walker was also charged with mail fraud and honest services mail fraud for misusing his political campaign funds, and with filing a false tax return with the Internal Revenue Service and helping prepare a false charitable tax return, in violation of 26 U.S.C. § 7206(1).

After a jury trial, Walker was acquitted of the tax evasion charges and one of the Grady counts, but was found guilty on all other counts. The corporate defendants were also found guilty on all counts for which they had been charged. At sentencing, the court found that Walker had a criminal history category of I and a base offense level of 6. The court also found that the Augusta Focus and Classic counts should be grouped together under the United States Sentencing Guidelines. The total loss valuation for those counts was between $650,639.65 and $675,639.65, leading to an adjusted offense level of 20.[4] Further, the district court ruled that the use of sophisticated means, abuse of trust, misrepresentation of a charity, and supervisory role Guidelines enhancements applied. This led to a total offense level of 29, which resulted in a Guideline sentence range of 87 to 108 months. The district court exceeded the advisory Guidelines and sentenced Walker to 121 months, finding that

the Guideline sentence did not sufficiently represent the criminal conduct involved.[5] With that background, we examine each issue presented for our review.

*Discussion*

I.

The *Batson* Challenges

Defendants first contend that the district court erred by sustaining the government's challenge to four of their peremptory strikes during jury selection in violation of *Batson v. Kentucky*. They also challenge the district court's remedy to correct the *Batson* violations by reinstating the four struck jurors and refusing to give Defendants four new peremptory strikes to compensate for the reinstated jurors.

Jury selection began with a pool of approximately seventy venire members and only lasted one day. The venire was drawn randomly from all six divisions of the Southern District of Georgia. The prospective jurors had earlier completed a questionnaire that asked them about any prior knowledge of the case. The questionnaire asked for information geared to determine their impartiality by learning their preferred news sources and other habits.

The court began jury selection with individual voir dire of the thirty-three potential jurors who had been exposed to pre-trial publicity or had suggested that they could not be impartial. After some of them were excused for cause, forty-seven of the original

---

4.   The court also grouped together the schemes involving Grady and the Medical College as Group 2, the schemes involving campaign funds as Group 3, and the schemes involving tax returns as Group 4. However, because the offense level was highest for the combined Augusta Focus and Classic schemes, only those offenses were used to calculate the base offense level. *See* U.S.S.G § 3D1.4.

5.   The corporate sentences were as follows: (1) the Augusta Focus was fined $34,000 and found jointly and severally liable, with Walker and the CWW Group, for restitution in amount of $212,700.77; (2) the CWW Group was fined $56,000 and found jointly and severally liable, with Walker, for restitution in the amount of $306,028.77; and (3) Georgia Personnel was fined $61,200.

2752                          U.S. v. WALKER

seventy jurors remained in the pool. Of these, forty-two were randomly selected to create a new pool of twenty-eight potential jurors, eight potential alternate jurors and six more "just in case." The twenty-eight potential jurors consisted of twelve white males, six white females, one black male, eight black females, and one Indian male. The potential alternates who remained in the pool consisted of four white males, two white females, and two black females. Defendants exercised all twelve of their peremptory challenges while the government used six of its eight challenges. Defendants used all of their strikes against white males, removing ten of twelve white males from the pool of potential jurors and two white males from the alternate pool. If jury selection had ended there, these peremptory strikes would have resulted in a jury of two white males, five white females, one black male and four black females, and an alternate pool of two white males, and two white females.[6]

The government and Defendants then objected to each other's peremptory challenges on the ground that they violated the principles set forth in *Batson v. Kentucky*. Prior to hearing each party's *Batson* argument, the court excused the six extra venire members.[7] The court then proceeded to consider the *Batson* challenges.

The government used all of its strikes against minorities. The court evaluated the government's strikes, and found them to be constitutional.[8] Then, the court asked Defendants to provide neutral explanations for each of their strikes. For jurors Lamb, McKinney, Wellman and Palmer, Defendants explained that they were struck because they

watched conservative news shows, listened to conservative radio commentators, or listened to Christian Gospel radio stations. They argued that these programs tend to be critical of Democrats and expressed concern that the jurors would not be completely impartial in a case involving Walker, an African–American Democratic politician. In rebuttal, the government argued that since a minister and two female jurors who watched conservative news shows were not struck, the reasons given for these strikes were pretextual. For jurors Hoats and Spitz, Defendants claimed that they were struck because, as regular readers of a local newspaper, the Augusta Chronicle, they were familiar with the case. Defendants also claimed that these jurors were not fully forthcoming during questioning. The government challenged this explanation by comparing these jurors to a female juror who also had prior knowledge about the case and was not struck. Finally, Defendants explained that they struck juror Heape on the ground that he was a member of the Confederate Sons of America and that they struck juror Kennedy because he was a lawyer and former criminal investigator. The government did not rebut these explanations. After due consideration, the district court found these eight strikes of white males to be valid.

In contrast, the court found that Defendants' four other peremptory strikes of white males were improper, namely the strikes of jurors Houston, McGee, Strakal and Manders. Defendants stated that juror Houston was removed because they did not want an individual with a BBA in Finance and experience as an accountant serving as a juror on a

6. Because the prosecution did not use two of their designated strikes, the district court excused the last prospective juror, a white female, and the last prospective alternate juror, a black female.

7. Both parties consented to this dismissal.

8. Defendants do not challenge this ruling on appeal.

case in which they planned to challenge accounting procedures. Defendants claimed that they struck juror McGee because of his experience working as a supervisor of a large number of employees. The government compared both jurors to a white female juror, Goodson, arguing that she was not removed even though she had similar financial acumen. Goodson, who had a high school education, worked as an office manager for a drug and alcohol screening company where she supervised five people. The district court found the strikes to be invalid.

Defendants also struck juror Strakal because they found his body language and demeanor to be hostile. The government claimed that since Defendants' lawyers asked no questions of Strakal, they did not have the opportunity to evaluate Strakal's demeanor. Finally, Defendants said they struck juror Manders on the ground that he had served on a city council before, and they did not want an elected official on the jury. The government responded that this reason was pretextual absent knowledge of Manders' party affiliation or bias. The district court agreed and rejected both strikes. Finding the peremptory strikes invalid as to jurors Houston, McGee, Strakal, and Manders, the court ordered that these four jurors be returned to the jury box.

After the four jurors were re-seated, Defendants requested four additional peremptory challenges to replace the ones that had been rejected. However, all the extra venire members had previously been excused. Finding that granting additional strikes would require re-conducting jury selection with an entirely new venire, the court denied Defendants' request. On appeal, Defendants challenge both the merits of the *Batson* rulings and the remedy chosen by the district court.

## The Three–Part *Batson* Test

[1] The Equal Protection Clause forbids a prosecutor from striking potential jurors solely on account of their race. *Batson v. Kentucky*, 476 U.S. at 86, 106 S.Ct. at 1717. In *Georgia v. McCollum*, 505 U.S. 42, 59, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33 (1992), the Supreme Court extended that restriction to strikes made by criminal defendants, and in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143, 114 S.Ct. 1419, 1429, 128 L.Ed.2d 89 (1994), the Court held that strikes based on gender were also constitutionally impermissible.

[2–6] In *Batson*, the Court laid out a three-part test to evaluate the validity of challenges to peremptory strikes. First, a moving party must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race or gender. *Batson*, 476 U.S. at 95–97, 106 S.Ct. at 1722–23. Once this requirement has been satisfied, the non-moving party must offer a race or gender-neutral basis for striking the juror in question. *Id.* at 97–98, 106 S.Ct. at 1723–24. Third, in light of both parties' submissions, the trial court must determine whether the moving party has shown purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724. In reviewing the district court's analysis, we give great deference to the district court's finding of whether a *prima facie* case of discrimination exists. *United States v. Stewart*, 65 F.3d 918, 923 (11th Cir.1995). Once past the *prima facie* step, the district court's determination concerning the actual motivation behind each challenged strike amounts to pure factfinding, and we will reverse only if the decision is clearly erroneous. *Id.*

[7] Defendants first argue that the government failed to make a *prima facie* case of purposeful discrimination. They argue that

white males are not a legally protected group for *Batson* purposes. They further claim that in light of the overall jury composition, the fact that all of their strikes were against white males is insufficient to demonstrate a pattern of discriminatory strikes. They allege that instead of requiring the government to satisfy its burden of establishing a *prima facie* case, the district court largely ignored the first step and unfairly placed the burden on them to explain their strikes.

[8] We have held that a *prima facie* case must be established before there is any further inquiry into the motives for the challenged strikes. *United States v. Ochoa–Vasquez*, 428 F.3d 1015, 1038 (11th Cir.2005). While a moving party is required to present evidence other than the bare fact of a juror's

removal to satisfy this requirement, a pattern of strikes against all venire members of one race or gender is considered significant. *United States v. Allen–Brown*, 243 F.3d 1293, 1297 (11th Cir.2001).[9]  Indeed, when "a party strikes all or nearly all of the members of one race on a venire," we have noted that this pattern of strikes against "jurors of one race . . . may be sufficient by itself to establish a *prima facie* case." *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty, Co.*, 236 F.3d 629, 637 (11th Cir.2000).

Defendants correctly point out that a *prima facie* case requires a showing that a cognizable group was excluded, *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723, and they argue that the district court erred in treating white males as such.[10]  However, the district court

---

9.  In *United States v. Allen–Brown* we instructed the district court to take into account the totality of circumstances when deciding if the moving party has established a *prima facie* case. 243 F.3d at 1297–98.  Specifically, we asked the courts to consider (1) whether there was a pattern of strikes against venire members of one race; (2) questions or statements during voir dire or in exercising challenges that suggested a discriminatory purpose; (3) the racial composition of the pool of remaining jurors; (4) the race of the defendant; and (5) the nature of the crime charged. *Id.*

10.  The Supreme Court has not yet ruled whether constitutional protections afforded to race-based groups in *Batson*, and gender-based groups in *J.E.B. v. Alabama ex rel. T.B.*, extend to combined race-gender groups.  State courts examining this question under their own constitutions and precedents are divided on the issue, although they have generally treated combined race-gender groups as cognizable groups. *See, e.g., Commonwealth v. Jordan*, 439 Mass. 47, 785 N.E.2d 368, 380 (2003) (finding that white males are a cognizable group); *People v. Motton*, 39 Cal.3d 596, 217 Cal.Rptr. 416, 704 P.2d 176, 181 (1985) (treating black women as cognizable group); *State v. Shepherd*, 989 P.2d 503, 511 n. 4 (Utah Ct.App.1999) (calling a trial judge's assumption that white males are not a cognizable group "erroneous"). *But see People v. Washington*, 257 Ill.App.3d 26, 194 Ill.Dec. 854, 628 N.E.2d 351,

356 (1993) (refusing to recognize black males as a cognizable group).

In *United States v. Dennis*, 804 F.2d 1208, 1210 (11th Cir.1986), we declined to treat "black males" as a cognizable group for *Batson* purposes, and in *United States v. Nichols*, 937 F.2d 1257, 1262 (7th Cir.1991), the Seventh Circuit similarly declined to recognize "black females" as a discrete category.  However, both these cases were decided before the Supreme Court banned gender-based challenges in *J.E.B. v. Alabama ex rel. T.B* and the reasoning in both *Dennis* and *Nichols* suggests that their holdings were greatly influenced by the fact that gender was not considered a discrete classification. *See Nichols*, 937 F.2d at 1262 (noting that the *Batson* ruling is limited to the *racially* discriminatory use of peremptory challenges); *Dennis*, 804 F.2d at 1210 (discussing only whether black males were a "cognizable racial group").  Examining the issue after the Supreme Court's ruling in *J.E.B. v. Alabama ex rel. T.B.*, the Ninth Circuit noted that race-gender groups are "worthy of consideration" in light of the changed law, although it declined to decide the issue on procedural grounds. *Turner v. Marshall*, 63 F.3d 807, 812 (9th Cir.1995), *overruled on other grounds*, *Tolbert v. Page*, 182 F.3d 677 (9th Cir.1999).  While we agree with the Ninth Circuit that whether *Batson* applies to combined race-gender groups is a question that merits a determination

clearly stated that it did *not* treat white males as a category in of itself. Rather, the court determined that Defendants engaged in intentional discrimination based on race. There is enough evidence to support the district court's findings based on race, without considering the combined race-gender category.[11] Defendants used all of their ten strikes against whites, striking ten of the eighteen white jurors available. Defendants also used both of their alternate strikes to remove whites from the alternate jury pool. While striking members of only one race does not always create an inference of purposeful discrimination, the sheer volume of strikes against one race are not easily attributable to chance.[12]

Further, the district court expressly noted that it considered not just the pattern of strikes, but the "totality of the circumstances" in making its determination. *See Allen-Brown*, 243 F.3d at 1298. This suggests that the court took factors such as the race of Defendant and the nature of the crime charged into account when making its determination. We give great deference to the district court's determination of a *prima facie* case, and in light of Defendants' pattern of strikes and the totality of the circumstances, we cannot say that the district court erred in concluding that the government established a *prima facie* case of racial discrimination.

[9, 10]  Turning to the second step of the *Batson* analysis, Defendants were required to articulate race-neutral reasons for their strikes. *Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723–24. Under *Batson*, almost any plausible reason can satisfy the striking party's burden, as long as the reason is race or gender neutral. Courts have upheld reasons deemed to be superstitious, silly, or trivial, as long as they are race or gender-neutral. *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Defendants' reasons clearly satisfy this step.[13]

---

at some point, we need not decide the issue today.

11. Defendants struck ten out of the fourteen available male jurors. Thus while half the original jury pool was male, the final jury, prior to re-seating, consisted of only two men. However, since the district court found purposeful discrimination on the basis of race, we will not consider the possibility of gender discrimination in this opinion.

12. In *Central Alabama Fair Housing Center*, we observed that "a showing that a party used its authorized peremptory strikes against jurors of one race does not, standing alone, establish a *prima facie* case of discrimination" since such strikes may simply reflect the composition of the venire. 236 F.3d at 637. We thus concluded that two strikes against white jurors where 80% of the venire members were white did not, standing alone, support an inference of discrimination, especially since the striking party did not use all of its peremptory challenges. *Id.* at 637–38. The facts in this case are distinguishable. Here, Defendants used not two, but all *ten* strikes

to remove whites from a panel that was two-thirds white.

13. Defendants argue that the district court was influenced by its perception of the merits of the stated reasons, a consideration forbidden under *Batson's* second step. *Purkett*, 514 U.S. at 768, 115 S.Ct. at 768. They correctly assert that their only burden in this step was to provide a race or gender neutral reason, and they argue that the court erred because it considered whether the stated reasons were good ones, rather than whether they were neutral. Our review of the transcript and order does not support this argument. Although the district court questioned the logic of some of the strikes during the discussion, in its final analysis it clearly indicated that it considered only the genuineness of the reasons provided. The court stated:

When I reviewed the articulation of contended race neutral explanation[s] for the striking of the jurors in question[,] I do not employ any subjective analysis as to whether I thi[nk] a good or bad reason. Simply put[,] I w[ill use] the rationale of whether I can conclude, under

On *de novo* review, we are, however, somewhat troubled by the district court's analysis at the third step. Based on the record alone, we are unable to distinguish the court's rationale in denying these four strikes while allowing the other eight. If Defendants' decision to strike a juror who listens to conservative radio stations is considered acceptable despite evidence that there were other jurors with the same characteristic who were not stricken, we do not see how Defendants' decision to strike, for instance, a juror that supervises other employees can be considered discriminatory simply because another juror with a supervisory job was not challenged. We find it difficult to conclude that the government satisfied its burden of showing that these four strikes were pretextual, when similar evidence was rejected for the other strikes.

**[11]** On the other hand, the district court's perception of an attorney's credibility is an essential part of determining whether a proffered reason was pretextual. The record does not always show us definitively what the district court saw and heard. *Miller-El v.*

*Cockrell,* 537 U.S. 322, 339, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (noting that deference to a district court is "necessary because a reviewing court, which analyzes only the transcripts from *voir dire,* is not as well positioned as the trial court is to make credibility determinations"). It is true that the record suggests that reasonable explanations were offered for the four strike—explanations that are not easily defeated by rebuttal or distinguishable from those presented for the other strikes. However, in considering whether strikes are pretextual, the Supreme Court has asked lower courts to focus on the *genuineness* of the explanation, rather than its reasonableness. *Purkett,* 514 U.S. at 769, 115 S.Ct. at 1771–72. The trial judge is in the best position to evaluate an attorney's candor and ferret out purposeful discrimination. *Miller-El,* 537 U.S. at 339, 123 S.Ct. at 1041. Thus, while we are troubled by the weakness of record evidence in support of these four *Batson* challenges, especially as compared to other strikes, we are constrained to defer to the district court's findings on the genuineness of these reasons and, correspondingly, on the likelihood of pur-

---

the totality of all of the circumstances, that the reason or reasons articulated is an actual, genuine, true or real reason for the exercise of the peremptory challenges.

Similarly, in discussing the individual strikes, the court did not comment on the merits of the reasons proffered and instead emphasized that it found that the stated reasons were not genuine:

THE COURT: With respect to those individuals I am … not persuaded that a genuine, race neutral reason for the elimination of those jurors has been articulated.

Admittedly, Mr. Houston does have some education and experience in the field of accounting.

Mr. Strakal has not demonstrated any body language that I could see and I have had no specification of any body language that he has exhibited which is sufficient to persuade me that the reason articulated for his elimination was a race neutral reason.

The articulation of the striking Mr. Manders, because he has served on the city council of a small town in south Georgia is a stretch. *That is simply not the reason why he was struck.*

John McGee, who is a supervisor over sixty employees with the Brunswick Housing Authority was not developed in any way other than by the articulation that he is a supervisor. As to whether there is some other explanation about what goes along with being such a supervisor I won't speculate, but as this record now stands it is my conclusion that the articulated reason is not a *genuine* race neutral reason for his having been stricken from this jury panel.

Consequently, he is going to be re-seated along with these other jurors Mr. Houston, Mr. Strakal and Mr. Manders in the place were they were stricken.

(emphasis added).

poseful discrimination. Therefore, we find no error in the district court's decision to reject the defendants' peremptory strikes as to jurors Huston, McGee, Strakal and Manders.

We have found no other indication in the record that the district court ignored compelling evidence or applied an incorrect legal standard. Nor do we find any evidence that the district court improperly shifted the burden of proof from the government to the Defendants anywhere along the way. In light of the deference owed to the district courts, and most particularly to their credibility findings, we must affirm the decision to award the government these four *Batson* challenges.

### The *Batson* Remedy

[12] Next, we examine the remedy used to correct the *Batson* violations. The court re-seated the four improperly struck jurors. Since the extra venire persons in the original pool could not be used because they had already been dismissed, the court declined to give the Defendants four additional peremptory challenges, to replace the ones lost. The court explained that doing so would require dismissing the entire venire and re-conducting jury selection.

[13, 14] In *Batson*, the "Supreme Court made it clear that the fashioning of a remedy [for an unconstitutional strike] is a matter upon which [the lower] courts are to be accorded significant latitude." *Koo v. McBride*, 124 F.3d 869, 873 (7th Cir.1997) (discussing *Batson*); *see also McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir.1996) (holding that the *Batson* "error is remediable in any one of a number of ways"). As with the remedy for any constitutional violation, the lower courts are instructed simply "to take as [their] touchstone the basic proposition that the nature of the remedy must be determined by the nature and the scope of the constitutional violation." *Koo*, 124 F.3d at 873 (citing *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977)). Additionally, courts are encouraged to take into account the practicalities of the situation. *Id.* We review their chosen remedy only to see if they abused their discretion. *See Batson*, 476 U.S. at 99 n. 24, 106 S.Ct. at 1725 n. 24; *Koo*, 124 F.3d at 872.

Although it declined to designate a specific remedy in *Batson*, the Supreme Court has suggested that reinstating an improperly struck juror is one of the remedies available to the trial courts. *Batson*, 476 U.S. at 99 n. 24, 106 S.Ct. at 1725 n. 24. In appropriate circumstances, we have accepted this remedy in this Circuit. *See, e.g., Stewart*, 65 F.3d at 922-23.[14] In this case, the district court rationalized that re-seating the jurors placed Defendants in the position that they would have been in had they not improperly used their strikes, and that giving them their four strikes back would improperly reward them for violating *Batson*.

The Supreme Court has also been silent on whether disqualified peremptory strikes should be replaced, leaving that question to the remedial power of the lower courts. Some courts have found replacement strikes to be appropriate. *See, e.g., United States v. Ramirez-Martinez*, 273 F.3d 903, 910 (9th Cir.2001), *overruled on other grounds, United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc) (finding that replacement

---

14. In addition to re-seating jurors, courts have suggested that "additional jurors might be called to the venire and additional challenges granted to the [injured party]; or in cases where those remedies are insufficient, the jury selection might begin anew with a fresh panel." *McCrory*, 82 F.3d at 1247.

strikes were properly granted when the lower court held that the *Batson* decision was very close and carefully monitored the government's use of the new strikes). Other courts have refused to grant new peremptory strikes or to dismiss the venire following a *Batson* error, finding that doing so would reward offending conduct by the striking party. *See, e.g., Peetz v. State,* 180 S.W.3d 755, 760 (Tex.App.Ct.2005) (affirming a decision to deny replacement strikes following a *Batson* error); *People v. Willis,* 27 Cal.4th 811, 118 Cal.Rptr.2d 301, 43 P.3d 130, 135, 139 (2002) (upholding trial court's refusal to dismiss remaining venire when party had engaged in racially motivated strikes against potential jurors); *People v. Moten,* 159 Misc.2d 269, 603 N.Y.S.2d 940, 947 (Sup.Ct. 1993) (noting that dismissing entire venire upon a successful *Batson* challenge would reward the wrongdoer and rejecting the remedy). We decline the invitation to craft any kind of bright-line rule to circumscribe the district court's discretion, and find that the circumstances here led to a defensible approach to rectify the *Batson* violation.

The venire in this case was drawn from a geographically diverse pool, and some of the jurors had driven several hours to attend. The *Batson* challenges were decided late in the evening, at around 8:00 P.M. The extra venire members, with Defendants' consent, had already been dismissed. Replacement strikes would have required that the court start anew the next day, at considerable time and expense. Although the better practice in certain circumstances is to begin afresh with a new venire, we cannot say that the

district court abused its discretion here.[15] Accordingly, we affirm the district court's *Batson* remedy.

## II.

### The Grady Counts

[15–18] Walker, joined by the CWW Group and Georgia Personnel, next challenge the sufficiency of the indictment and the evidence used to convict them on the Grady counts. We review *de novo* whether an indictment sufficiently alleges a statutorily proscribed offense. *United States v. Woodruff,* 296 F.3d 1041, 1045 (11th Cir.2002). We also review *de novo* the sufficiency of the evidence supporting a criminal conviction. *United States v. Silvestri,* 409 F.3d 1311, 1327 (11th Cir.2005). In doing so, we review the evidence in the light most favorable to the government, "drawing all reasonable inferences and making all credibility choices in the government's favor." *Id.* We will reverse a conviction based on insufficient evidence "only if no reasonable trier of fact could have found guilt beyond a reasonable doubt." *United States v. Gunn,* 369 F.3d 1229, 1234 (11th Cir.2004).

[19, 20] The indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c). An indictment is sufficient if "[i]t (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indict-

---

15. The record does not suggest that the four jurors who were struck and then re-seated knew that they were initially struck, and by whom. We thus have no cause to question the re-seating remedy employed by the district court judge. *State v. McCollum,* 334 N.C. 208, 433 S.E.2d 144, 159 (1993) (observing that "[t]o ask jurors

who have been improperly excluded from a jury ... to then return to the jury [and] remain unaffected by that recent discrimination, and to render an impartial verdict without prejudice toward ... the defendant, would be to ask them to discharge a duty which would require near superhuman effort ...").

ment as a bar against double jeopardy for any subsequent prosecution for the same offense." *Woodruff,* 296 F.3d at 1046. An indictment's sufficiency is determined from its face. *United States v. Sharpe,* 438 F.3d 1257, 1263 (11th Cir.2006). An indictment that tracks the language of the relevant statute is sufficient, as long as it also provides a statement of facts and circumstances that give notice of the offense to the accused. *Russell v. United States,* 369 U.S. 749, 765, 82 S.Ct. 1038, 1048, 8 L.Ed.2d 240 (1962).

[21] With regard to the Grady counts, the indictment tracked the language of the mail fraud statute and alleged several facts supporting an overall scheme to misuse Walker's office for private gain and therefore deprive his constituents of their right to his honest services as a legislator. It alleged that Walker attempted to influence legislation affecting the hospital and that, in exchange, his temp agency, Georgia Personnel, received business favors from Grady. The indictment alleged that Walker obtained the financially lucrative Georgia Personnel contract from Grady through a bid-rigging process, which ensured that Walker was allowed to make changes in his bid when necessary, and guaranteed that he was the lowest bidder. Additionally, it alleged that Grady catered to Walker's demands that Grady hire more Georgia Personnel workers. Finally, it alleged that Walker failed to properly disclose his financial dealings with Grady in his annual financial disclosure statements. Taken together, these facts are sufficient to create an overall picture of the fraudulent

scheme at issue, to put Walker on notice of the charged conduct, and to enable him to defend himself at trial. *Id.* at 765, 82 S.Ct. at 1048. We find no merit to his claim that the language of the indictment was insufficient to charge him with honest services mail fraud.

[22–24] We also find that the evidence at trial was sufficient to support a conviction for honest services mail fraud. The mail fraud statute prohibits the use of the in furtherance of a scheme to defraud. 18 U.S.C. § 1341. To prove mail fraud, the prosecution must demonstrate that the defendant (1) participated in a scheme or artifice to defraud and (2) used the United States mails to carry out that scheme. *United States v. Hooshmand,* 931 F.2d 725, 731 (11th Cir.1991). The honest services provision of the mail fraud statute, 18 U.S.C. § 1346, "allows the United States to predicate a mail fraud prosecution on a scheme or artifice to deprive another of the intangible right to honest services." *United States v. Waymer,* 55 F.3d 564, 568 (11th Cir.1995) (internal quotation marks omitted).[16] The term "honest services" is not defined in the statute, but we have found that "when a political official uses his office for personal gain, he deprives his constituents of their right to have him perform his official duties in their best interest." *United States v. Lopez–Lukis,* 102 F.3d 1164, 1169 (11th Cir. 1997). "Public officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest." *United States v. deVegter,* 198 F.3d

---

16. The honest services amendment, 18 U.S.C. § 1346, was passed to override the Supreme Court decision in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *McNally* had prohibited prosecution under the mail fraud statute of schemes to deprive citizens of intangible rights such as honest services. *Id.*

at 359, 107 S.Ct. at 2881. "Congress' purpose in enacting section 1346 was to restore the mail fraud statute to its pre-*McNally* position by allowing mail fraud convictions to be predicated on deprivations of honest services." *Waymer,* 55 F.3d at 568 n. 3.

1324, 1328 (11th Cir.1999). "If an official instead secretly makes his decision based on his own personal interests—as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest," the official has deprived the public of his honest services. *Lopez–Lukis,* 102 F.3d at 1169.

[25, 26]   The scope of conduct covered by the honest services mail fraud statute is extremely broad. *See United States v. Sawyer,* 85 F.3d 713, 725 (1st Cir.1996). Nevertheless, even if a public official engages in "reprehensible misconduct related to an official position," his conviction "for honest-services fraud cannot stand where the conduct does not actually deprive the public of its right to [his] honest services, and it is not shown to *intend* the result." *Id.* (emphasis added). Conversely, once the government establishes a scheme formed with the intent to defraud, the honest services fraud is complete "regardless of how that intent manifests itself in execution." *United States v. Antico,* 275 F.3d 245, 264 (3d Cir.2001); *deVegter,* 198 F.3d at 1328 ("A public official's undisclosed conflict of interest ... *does by itself* harm the constituents' interest in the end for which the official serve—honest government in the public's best interest." (emphasis added)); *United States v. Jain,* 93 F.3d 436, 441 (8th Cir.1996) (finding that for a successful prosecution following the showing of intent, "[t]he scheme to defraud need not have been successful or complete" (internal quotation marks omitted)); *United States v. Holzer,* 816 F.2d 304, 308 (7th Cir.) (finding that judge's systematic receipt of bribes and "loans" to influence official actions constituted mail fraud regardless of whether or not he ruled differently on any cases), *vacated,* 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987) (ordering reconsideration in light of *McNally*); *United States v. George,* 477 F.2d 508, 512 (7th Cir.1973) (finding that when there

was a scheme formed with the intent to deprive a company of its employee's honest services it was irrelevant that the employee did not actually exert special influence in favor of the supplier providing the bribe).

[27]   Defendants argue that there is insufficient evidence of Walker's agreement to any scheme through which Walker received benefits in exchange for his official services. They allege that while Grady officials may have hired Georgia Personnel workers in the hope of receiving legislative benefits from Walker, there was no evidence that Walker was personally a party to this scheme. Further, they argue that the government failed to prove the existence of a quid pro quo arrangement, in that there was no evidence that Walker did anything in particular as a legislator to benefit Grady.

At trial, the government presented evidence that prior to a legislative session where measures affecting Grady would be debated, Walker began meeting with Grady's Chief Executive Officer, Ed Renford. During a meeting at the state capitol, when Renford was meeting with Walker in his legislative capacity, Walker suggested that Grady hire workers through his temp agency. A Grady employee, Joyce Harris, testified that Renford, in Walker's presence, introduced Walker to her as someone who would be doing business with Grady and would help with certain legislation. Renford instructed Harris to do business with Walker, which she interpreted as an order to ensure that Walker's temp employees were hired. Grady employees then solicited a bid from Georgia Personnel, encouraged him to resolve any deficiencies, allowed him to submit the bid out of time, and ultimately awarded the contract to Georgia Personnel. Grady employees testified that Walker repeatedly

requested that Grady hire additional Georgia Personnel workers, and that Georgia Personnel hires were cost-ineffective to Grady. They also testified that Renford sought weekly reports on the hires, which was an unusual level of involvement on his behalf. Yet, the government did not come forward with any evidence that Walker improperly influenced any legislation benefitting Grady.

Drawing all inferences in favor of the government, as we must, we find the evidence sufficient to support an honest services mail fraud conviction.[17] The jury could have inferred that by raising the issue of Georgia Personnel workers at a meeting at the state capitol, Walker let Grady know that his legislative influence would be forthcoming in exchange for Grady hiring his temp workers. Renford's comment about Walker's legislative assistance could also be interpreted as evidence of Walker's participation in the scheme. Finally, the jury could have concluded that by repeatedly requesting that Grady hire additional Georgia Personnel employees, Walker was communicating his belief that he was entitled to the business in exchange for legislative assistance. *See Evans v. United States*, 504 U.S. 255, 274, 112 S.Ct. 1881, 1892, 119 L.Ed.2d 57 (1992) (Kennedy, J., concurring) (finding that under the Hobbs Act, a quid pro quo with the attendant corrupt motive can be inferred from an ongoing course of conduct). These inferences support a finding that Walker intended to participate in a scheme to personally gain from his position as a legislator and thus, regardless of the ultimate course of legislation, deprive the public of his honest services.

17. State legislators often have careers and businesses beyond their roles as a state official. Such legislators are not guilty of honest services mail fraud just because they engage in business with a company that may be involved in the legislative process. But, we find that the record in this case

*Antico*, 275 F.3d at 264; *Jain*, 93 F.3d at 441.

## III.

### The Medical College Counts

[28]  In the Medical College counts, Walker was charged with mail fraud and honest services mail fraud for (1) making false representations to the Medical College officials about his ownership interest in Georgia Personnel and the Augusta Focus in order to get around state rules prohibiting state office holders from contracting with state agencies; and (2) for failure to disclose the transaction. Defendants argue that the fraud alleged in the Medical College scheme is predicated on the violation of state financial disclosure rules and a non-criminal state ethics provision prohibiting legislators from doing business with state entities. They claim that enforcement of state ethics rules is solely within the power of the states, and that prosecution in federal court unconstitutionally infringes on this state power.

[29, 30]  The principles of federalism recognize that the states and the federal government exist as dual sovereigns, constraining the federal government from exerting federal power in areas that the Constitution reserves to the states. *See, e.g., Linder v. United States*, 268 U.S. 5, 19, 45 S.Ct. 446, 449, 69 L.Ed. 819 (1925); *Keller v. United States*, 213 U.S. 138, 148, 29 S.Ct. 470, 473, 53 L.Ed. 737 (1909). Pursuant to traditional norms of federalism, a federal court may not instruct state officials on how to conform their conduct to state law, because this power is re-

is sufficient for a reasonable jury to conclude that Walker's activities were not representative of such routine business practices. Instead, it demonstrates a scheme by Walker to enrich himself by using his legislative position as a bargaining tool.



served to the states. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). Relying on these principles, Defendants argue that a prosecution predicated on a non-criminal state ethics provision is unconstitutional, since only the state is entitled to criminalize Walker's conduct.

[31] We disagree. The claims against Walker were not predicated on any violation of state law. In fact, the jury instructions specifically cautioned jurors *not* to decide whether Walker violated any state law, but to consider those laws only to the extent that the evidence indicated an intent to commit fraud on Walker's part. Moreover, an honest services mail fraud or mail fraud conviction does not require proof of a state law violation. *United States v. Hasner,* 340 F.3d 1261, 1269 (11th Cir.2003); *see also Longford v. Rite Aid of Ala., Inc.,* 231 F.3d 1308, 1312–13 (11th Cir.2000) (finding that when a relationship of trust exists between parties, a duty to disclose information can be found even in the absence of a statute or regulation). Thus, the jury could have found that Walker violated the mail fraud statutes by failing to disclose his relationship with the Medical College without considering the state ethics requirement. We therefore find that Walker's federalism claims have no merit, and we affirm the convictions on the Medical College counts.

IV.

Sentencing

[32, 33] Finally, Walker challenges various aspects of the district court's sentencing calculation. For sentencing decisions, we re-

view the district court's factual findings for clear error. *United States v. Crawford,* 407 F.3d 1174, 1177–78 (11th Cir.2005). However, the district court's decision of whether the factual findings justify a sentencing enhancement is reviewed *de novo. United States v. Barakat,* 130 F.3d 1448, 1452 (11th Cir.1997).

[34] Walker, joined by the CWW Group, first alleges that the district court erred in calculating that the loss amount related to the forty-six Classic counts was $425,000.[18] Walker was accused of defrauding Classic, a not-for-profit organization established to bring college football to Augusta and to raise money for scholarships for underprivileged students attending college. Walker, the de facto head of the charity, was convicted of using Classic funds for personal purchases and for stealing cash proceeds from the Classic fundraisers. He argues that since he was acquitted of failing to pay taxes on the excess income, there should have been no loss amount attributable to him from the alleged Classic fraud. Further, he claims that all his purchases were approved by the Classic Board of Directors and therefore, no fraudulent expenditures were made.

[35] We have previously rejected the argument that a jury acquittal on one count implies a finding as to the loss amount. *United States v. Hamaker,* 455 F.3d 1316, 1336 (11th Cir.2006) (finding that sentencing courts may consider both uncharged and acquitted conduct in determining a sentence). Additionally, review of the record demonstrates that, contrary to Walker's assertions, there is evidence that his activities relating to the Classic counts were not approved by the Classic Board and the court was thus

---

18. This loss amount, along with the loss associated with the Augusta Focus counts, was used in

calculating Walker's adjusted offense level.

entitled to factor in any related loss. Walker also argues that any loss attributed to him is inexact and is thus unreliable. Although we have held that the district court's loss calculation may not be mere speculation, we have also said that the district court is not required to be completely precise, and its decision will survive review as long as it makes a reasonable estimate of the loss amount, which the court did here. *United States v. Renick,* 273 F.3d 1009, 1025–26 (11th Cir. 2001). Thus, Walker's argument that the district court's estimate was imprecise is without merit and the loss calculation survives review.

[36]   Next, Walker argues that the abuse-of-trust enhancement pursuant to U.S.S.G. § 3B1.3 was improper because there was no evidence that he abused a position of trust at Classic. The abuse of trust enhancement applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. We have held that for this enhancement to apply, the government must establish both that (1) the defendant held a place of private or public trust; and (2) abused that position in a way that significantly facilitated the commission or concealment of the offense. *United States v. Ward,* 222 F.3d 909, 911 (11th Cir.2000). We have also held that this enhancement only applies when the victim conferred the trust. *United States v. Garrison,* 133 F.3d 831, 837–39 (11th Cir.1998).

[37]   The record demonstrates that Walker exercised virtually unfettered decision-making in running the Classic charity event. He was also responsible for collecting money earned by the charity. He clearly held a position of trust, granted to him by the Classic Board, which exercised no oversight over

his activities. Since that position allowed him to embezzle money from Classic, the criteria for abuse-of-trust enhancement appears to have been met, and we find that the enhancement was properly applied.

[38]   Third, Walker argues that the district court erred by imposing an enhancement for misrepresentation of a charitable organization. This enhancement applies when the offense involves "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government agency." U.S.S.G. § 2B1.1(b)(8)(A). Walker argues that imposing this enhancement leads to impermissible double counting of the same conduct that was accounted for under the abuse-of-trust enhancement. We disagree and find that the Sentencing Guidelines intend to apply these two enhancements cumulatively. As we have previously noted, each Guideline section "concerns conceptually separate notions relating to sentencing" and a sentencing court should "apply separate guideline sections cumulatively unless specifically directed otherwise." *United States v. Stevenson,* 68 F.3d 1292, 1294 (11th Cir.1995). Although we have not directly compared these two enhancements, the Seventh Circuit ruled in *United States v. Arnaout,* 431 F.3d 994, 999–1000 (7th Cir.2005), that the two enhancements are distinct and both may be applied because they punish different harms. Here, Walker's conduct harmed the charity, thus meriting an abuse-of-trust enhancement, as well the charity's donors, warranting a separate enhancement for misrepresentation of a charity. We therefore find that the district court did not err in applying both enhancements.

[39]   Finally, Walker argues that the court erred in applying the supervisory-role

enhancement, U.S.S.G. § 3B1.1(b), since there were no other participants in this scheme. This enhancement applies "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants *or* was otherwise extensive." U.S.S.G. § 3B1.1(b) (emphasis added). A participant is someone who is criminally responsible for the commission of the offense, regardless of whether he was convicted. U.S.S.G. § 3B1.1, cmt. 1. Here, the district court noted that there were no other individuals who could be held criminally responsible for this scheme and thus Walker did not qualify for the enhancement under the "five or more participants" prong. However, the district court found that the criminal activity was "otherwise extensive" and ruled that the enhancement applied under this alternate theory.

[40] As Walker correctly points out, for a criminal activity to qualify as "otherwise extensive," there must still be at least one other participant. *United States v. Holland*, 22 F.3d 1040, 1045 n. 8 (11th Cir.1994). The court thus clearly erred in imposing this enhancement when it separately found that there were no other participants in the scheme. *See id.* We can affirm however, when the result was correct, even though the reasoning was wrong. *See United States v. Simmons*, 368 F.3d 1335, 1342 (11th Cir. 2004). We held in *United States v. Eidson*, 108 F.3d 1336, 1345 (11th Cir.1997), that the employees are participants for purposes of the supervisory-role enhancement when they knowingly further the fraudulent scheme.

The record indicates that Augusta Focus employees knew the actual circulation numbers and actively misinformed advertisers of the inflated numbers. Classic employees assisted the fraud by writing checks either to themselves, fellow employees, or to "cash" and then giving the money to Walker. Their efforts to channel money via third parties demonstrates that they knew that giving the money to Walker was improper. Further, Walker's daughter was indicted for her role in the fraud and pled guilty to tax charges related to the scheme. Thus, although not recognized by the district court, others participated in Walker's scheme, justifying the application of this enhancement. Accordingly, we find that any error by the district court in its analysis was harmless, and affirm.

*Conclusion*

In sum, we find that the district court did not err in granting the government's *Batson* challenge against four of Defendants' peremptory strikes, or abuse its discretion in fashioning a remedy for the *Batson* violation. We also find no error with regard to the court's decisions on the sufficiency of the indictment and evidence on the Grady counts, nor do we find any constitutional limitations on Walker's prosecution for the Medical College counts. Finally, we find that any error in the court's sentencing calculation is harmless, and affirm Walker's sentence.

AFFIRMED.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit
By: Deputy Clerk
Atlanta, Georgia